UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

P.G. and R.G., individually and on behalf
of D.G., a child with a disability,

Plaintiffs,

v.

CITY SCHOOL DISTRICT OF NEW YORK,

Defendant.

------------------------------------------------------X

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____              │
│ DATE FILED: February 25, 2015        │
└─────────────────────────────────────┘
```

14 Civ. 1207 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiffs P.G. and R.G., individually and on behalf of their special needs

child, D.G. (collectively, "Plaintiffs"), filed suit under the Individuals with

Disabilities Education Act (the "IDEA," formerly known as the Individuals with

Disabilities Act), 20 U.S.C. §§ 1400-1482, against Defendant City School

District of New York, d/b/a New York City Department of Education

("Defendant" or the "DOE").[1]  Plaintiffs bring this action (i) to recover costs they

incurred in sending D.G. to a private school for the 2012-2013 school year, and

(ii) to seek review of an October 21, 2013 decision of the State Review Officer

(the "SRO") that effectively denied Plaintiffs the ability to recover those costs

from the DOE.

---

[1]     The Court does not expressly name the child or the parents because "in an action
        commenced by a parent or guardian on behalf of a minor child pursuant to the IDEA,
        the plaintiffs should be permitted to proceed, as a matter of course, using initials in
        place of full names in public filings with the Court."  *P.M.* v. *Evans-Brant Cent. Sch.
        Dist.*, No. 08 Civ. 168A (RJA), 2008 WL 4379490, at *3 (W.D.N.Y. Sept. 22, 2008); *see
        also* Fed. R. Civ. P. 5.2(a); 20 U.S.C. § 1417(c).

The parties have cross-moved for summary judgment.  For the reasons set forth below, Defendant's motion is granted, and Plaintiffs' motion is denied.

## BACKGROUND[2]

As happens frequently in IDEA cases, this case is resolved short of trial, as a result of competing summary judgment motions.  The Court's inquiry in IDEA cases is "fact-intensive" and it is therefore "necessary to set forth in some detail the facts" presented in the record.  *R.E.* v. *N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012).

### A.    The Legal Framework

The IDEA "requires states to provide disabled children with a 'free appropriate public education'" (a "FAPE").  *Florence Cnty. Sch. Dist. Four* v.

---

[2]    The facts set forth herein are drawn primarily from the administrative record from the proceedings below, including the transcript ("Tr.") of the hearing before the impartial hearing officer (the "IHO"), the exhibits introduced during that hearing ("IHO Ex."), the decision of the IHO ("IHO Op."), and the decision of the SRO ("SRO Op.").  For convenience, Plaintiffs' opening brief is referred to as "Pl. Br.," Defendant's opening brief as "Def. Br.," Plaintiffs' reply and opposition as "Pl. Opp.," and Defendant's reply and opposition as "Def. Opp."  The Court waived the requirement that the parties submit Local Civil Rule 56.1 Statements at the request of the parties.  (*See* Dkt. #8).

Unfortunately, the Court must address the format of Plaintiffs' briefing.  The scheduling order permitted each party 50 pages, to be distributed as they saw fit across the two briefs they were each permitted.  (Dkt. #8).  This is 15 more pages than a moving party is typically entitled for an opening brief and reply.  In granting these extra pages at the May 7, 2014 conference, the Court specifically admonished the parties not to engage in formatting chicanery, such as using a smaller font size.  Additionally, the Local Civil Rules require that all briefing be *double*-spaced.  Local Civil Rule 11.1(b).

Plaintiffs' counsel filed briefs that, at first blush, together appeared to be just under the 50-page limit.  However, upon closer inspection, it is clear that Plaintiffs' counsel abused the page limit and violated the Local Rules by reducing the line spacing to slightly less than double-spaced.  This meant that rather than having 23 lines per page, Plaintiffs had 27 lines per page.  In so doing, Plaintiffs' counsel accorded themselves approximately 200 extra lines of text, or over 8.5 extra pages, onto an already-enlarged page limit.  Such amateurish tricks are inappropriate for college term papers; they certainly have no place in federal court.  *See In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 10 MDL 2179 (CJB), slip op. at 2-3 (E.D. La. Sept. 15, 2014).

*Carter*, 510 U.S. 7, 9 (1993) (citation omitted); *see also R.E.*, 694 F.3d at 174-75.  In accordance with this mandate, school districts are required to create an individualized education program ("IEP") for each qualifying child in order to ensure that the child receives a FAPE.  *See R.E.*, 694 F.3d at 175.

"The IEP, the result of collaborations between parents, educators, and representatives of the school district, sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  *T.Y.* v. *N.Y.C. Dep't of Educ.*, 584 F.3d 412, 415 (2d Cir. 2009) (quoting *Lillbask ex rel. Mauclaire* v. *Conn. Dep't of Educ.*, 397 F.3d 77, 81 (2d Cir. 2005)); *see also* 20 U.S.C. § 1414(d)(1)(A).  At the cornerstone of the IDEA is the requirement that the IEP be "reasonably calculated to enable the child to receive educational benefits."  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist.* v. *Rowley*, 458 U.S. 176, 207 (1982); *see also Gagliardo* v. *Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007) (citing *Walczak* v. *Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)).

In New York State, each school district has a Committee on Special Education ("CSE") that is responsible for developing IEPs for qualifying students within that district.  *Gagliardo*, 489 F.3d at 107.  A CSE is "comprised of members appointed by the local school district's board of education; it must include, among others, the student's parent(s), a regular or special education teacher, a school board representative, [and] a parent representative," and it

may include others.  *R.E.*, 694 F.3d at 175; N.Y. Educ. Law § 4402(1)(b)(1)(a).[3]
The CSE is responsible for examining the student's level of achievement and
specific needs in order to determine an appropriate educational program.  *R.E.*,
694 F.3d at 175.

If a parent believes that his or her child's IEP fails to comply with the
IDEA, the parent may seek relief by filing a due process complaint with the
appropriate state agency.  20 U.S.C. § 1415(b)(6).  Upon the filing of a due
process complaint, federal law mandates that the parent be provided with an
impartial due process hearing before an IHO.  *Id.* § 1415(f).  New York law, in
turn, requires a parent to pursue his or her claim first before an IHO; once the
IHO renders a decision, either party may appeal the decision to the SRO.  N.Y.
Educ. Law § 4404(1), (2).  After the SRO completes his or her review of the
IHO's decision, either party may file an action in state or federal court seeking
review of the SRO's decision.  20 U.S.C. § 1415(i)(2)(A).

**B.   D.G.'s Disability Classification and Placement Before the 2012-2013
Academic Year**

### 1.   D.G.'s Infancy and Early Childhood

Plaintiffs P.G. and R.G. are the parents of Plaintiff child D.G., a nine-
year-old girl whom the DOE has classified as having a learning disability and
who is accordingly entitled to a FAPE.  D.G. was born prematurely at 29 weeks,
and, since she was an infant, D.G.'s parents have carefully monitored her

---

[3]     A "parent representative," also referred to as a "parent member," is a parent of another
disabled student.  This parent attends the CSE meeting to provide information and
support to the parent of the student for whom the CSE meeting is being held.  *See* N.Y.
Educ. Law § 4402(a)(viii).

development.  (IHO Ex. D at 1).  Based on the results of an evaluation
conducted when D.G. was four months old, D.G.'s parents enrolled her in an
"Early Intervention" program that provided her from that point onward with
occupational therapy ("OT"), physical therapy ("PT"), and speech and language
therapy.  (*Id.*; *see also* Tr. 288-90).

At the age of five, D.G. was placed in an Integrated Co-Teaching ("ICT")
kindergarten class at New York City Public School ("P.S.") 52.  (Tr. 290-91).[4]
Her parents observed D.G. struggling with classwork while in kindergarten,
and her report card indicated that she was below grade level in reading.
(Tr. 291-98; IHO Ex. P).  By the time D.G.'s parents received her kindergarten
report card, the CSE for the 2011-2012 academic year had already met and
determined D.G.'s IEP for her first grade year, which was again placement in
an ICT class.  (Tr. 296-97).  At this time, the DOE classified D.G.'s disability as
a "speech or language impairment."  (*See* IHO Ex. H).

### 2.    Fall 2011 Brooklyn Learning Center Evaluation and Report

Concerned about their daughter's development and her below-grade-level
performance in kindergarten, D.G.'s parents had a private neuropsychological
evaluation conducted at the Brooklyn Learning Center (the "BLC").  The BLC
administered to D.G. a series of tests and assessments in August and

---

[4]    An ICT is a class in which "specially designed instruction and academic instruction [is]
provided to a group of students with disabilities and nondisabled students."  N.Y.
Comp. Codes R. & Regs. tit. 8, § 200.6(g).  The class must at minimum include one
special education teacher and one general education teacher, and cannot include more
than 12 students with disabilities and 25 students overall.  *Id.*; *see also* Tr. 29.

September of 2011.  (*Id.* at 298; IHO Ex. D at 1).  It then issued a report to

D.G.'s parents dated October 8, 2011 (the "BLC Report").  (IHO Ex. D).

      The BLC Report indicated that D.G. had "many cognitive strengths and a

willingness to work diligently in school and at home."  (IHO Ex. D at 12).

D.G.'s results on an IQ test, the Wechsler Intelligence Scale for Children –

Fourth Edition, showed that her overall intellectual functioning was in the

average range and on par with her peers in several domains.  (*Id.* at 2, 6).  The

BLC Report did, however, note that there was "variation and scatter" among

D.G.'s scores, which ranged from the below-average to the average range.  (*Id.*

at 6).

      While the evaluation noted that D.G. was in the average range and on

par with her peers in many of the cognitive tasks required for school success, it

also described several deficits that detracted from her ability to succeed

academically and perform tasks adequately.  (IHO Ex. D at 2, 6).  Specifically,

D.G. was found to struggle with language processing, memory span, fine motor

skills, and processing of visual information.  (*Id.* at 2).  The BLC corroborated

its findings with D.G.'s first-grade teacher, who had also observed D.G.'s

difficulties with language processing.  (*Id.*).  The BLC Report remarked that,

while D.G. had "certainly made gains in her speech and language skills," she

continued to need ongoing speech and language support to sustain her

progress.  (*Id.*).  Additionally, D.G.'s cognitive deficits in language, visual

processing, and memory affected her ability to develop phonological awareness

and rapid naming skills, which the BLC characterized as the skills that

"underlie reading." (*Id.* at 3).  The BLC Report diagnosed D.G. with Expressive-Language Disorder, Reading Disorder, and Disorder of Written Expression.  (*Id.* at 12).

The BLC Report described generally the methods of instruction that would benefit D.G.; for example, it suggested that she would respond more favorably to "hands-on, straightforward, and structured presentation of information ... in a clear verbal format rather than a visual format." (IHO Ex. D at 4).  The BLC Report also made specific recommendations regarding D.G.'s school placement, accommodations she should be permitted at school, suggestions for teachers to assist her learning in the classroom, and recommendations for D.G.'s development outside the classroom.  (*Id.* at 13-15).

In terms of D.G.'s school placement, the BLC Report concluded, "An appropriate placement needs a high teacher/student ratio in a small classroom with teachers trained to teach children with language and visual processing disabilities." (IHO Ex. D at 13).  At school, the BLC Report recommended that D.G. be permitted "to dictate assignments to a scribe to ensure that the process of writing does not interfere with her good ideas." (*Id.*).  It also made recommendations regarding future accommodations for note-taking, computer use, and additional time on standardized and classroom tests.  (*Id.* at 13-14).

### 3.   Discussions of D.G.'s Placement Following the BLC Report

After receiving the BLC Report, D.G.'s mother R.G. began researching private schools for D.G. based on a list of recommended schools provided by the psychologists at BLC.  (Tr. 329).  Around this time, R.G. also provided the

BLC Report to D.G.'s first-grade teachers at P.S. 52, who subsequently informed her that they had provided it to the assistant principal. (*Id.* at 300). In December 2011, after having received the BLC Report, the CSE opened D.G.'s case and held a meeting. (*Id.*). At that point, according to R.G., the CSE agreed to add the services of OT and of a reading specialist to D.G.'s IEP for the remainder of her first-grade school year. (*Id.* at 300-01). R.G. testified that at this meeting the assistant principal promised her that if D.G. were accepted at a private school, "they weren't going to fight [her] on it." (*Id.* at 302).[5]

That same month, R.G. visited private schools on her list and decided to submit an application to the Churchill School for D.G.'s enrollment during the 2012-2013 academic year. (Tr. 303-04). D.G. was accepted at Churchill School on February 14, 2012, and D.G.'s parents signed an enrollment contract with the school on February 20, 2012. (Tr. 304; IHO Ex. Y). R.G. testified that she signed the contract at that point because she "felt this was the best place for [D.G.]." (Tr. 325). On March 21, 2012, R.G. wrote the assistant principal at P.S. 52, requesting that the CSE convene to consider a "full-time special education school" setting for D.G. (IHO Ex. G).

---

[5]     Plaintiffs do not advance an estoppel argument based on these statements of the assistant principal, who, while present at the May 9, 2012 IEP meeting (Tr. 306), was not actually a member of the CSE team (*see* IHO Ex. I at 14). The IHO mentions the statement in passing to give context to D.G.'s parents' understanding that the May 9, 2012 IEP was for the purpose of confirming D.G.'s placement at the Churchill School. (IHO Op. 6).

### 4.    April 2012 Update to the BLC Report

In April 2012, at the request of D.G.'s parents, the BLC conducted another evaluation of D.G. and issued an addendum report on April 27, 2012 (the "BLC Addendum").  (IHO Ex. E).  The parents requested the report in order to (i) help them understand the areas in which D.G. needed continued support and remediation, and (ii) determine an appropriate educational placement for D.G.  (*Id.* at 1).  BLC administered several of the same academic assessment tools and some new ones.  (*Id.*; *see also* SRO Op. 13-14).  These tests revealed that D.G. continued to have significant deficits in her reading skills and actual reading ability, and that she was performing below first-grade level.  (IHO Ex. E at 1-2).  The BLC Addendum reported that D.G. had not made adequate gains in reading and writing over the preceding six months and continued to fall below grade level.  (*Id.* at 2-4).  It noted, however, that her math skills had progressed at an adequate pace.  (*Id.* at 3).

The updated report cautioned that without specialized curricula and instruction, D.G. would continue to fall behind in reading and writing.  (IHO Ex. E at 2-3).  The BLC Addendum concluded that D.G.'s current services and placement in an ICT class were "not appropriate" because she was "not making progress at a pace that is on par with her age peers."  (*Id.* at 4).  The BLC Addendum echoed the recommendation in the October 2011 BLC Report, stating, "[D.G.] requires a special education placement that provides a self-contained, small classroom environment with teachers who are specially trained to work with students with language-based disabilities and disabilities

9

in reading and writing." (*Id.*).  The report continued, "In order to have an appropriate ed[u]cational experience, she needs a small and nurturing classroom environment that provides structure and support.  She requires a setting designed to address the unique needs of bright youngsters with specific learning disabilities with individual support to remediate her learning issues." (*Id.*).  Nowhere did the original BLC Report or the Addendum make a recommendation regarding a specific class size or ratio, a specific curriculum, or a specific school.

### 5.   May 2012 DOE Psychological Update and Classroom Observations

In anticipation of preparing D.G.'s IEP for the 2012-2013 school year, the DOE conducted an updated psychological evaluation, which was memorialized in a May 3, 2012 report (the "DOE Update"), and two classroom observations in early May 2012.  (IHO Ex. 1, 2; Tr. 24-26).  In conducting the psychological evaluation, the DOE administered a variation of the IQ test that the BLC had administered in the fall of 2011, the Wechsler Abbreviated Scale of Intelligence. (IHO Ex. 1).  Like the BLC's IQ test, the DOE test showed that D.G. possessed an average full-scale IQ; it also showed that she was in the average range for performance IQ and in the high-average range for verbal IQ.  (*Id.* at 1-2).  The DOE Update noted that D.G. performed somewhat better on verbal expression and comprehension than on tasks requiring manipulations with concrete materials and visual motor integration.  (*Id.* at 2).  The report remarked that D.G. was friendly and cooperative, exhibited age-appropriate attention span and frustration, and did not present as a behavior problem.  (*Id.*).  The DOE

Update determined that D.G. was below her grade level in "visual/perceptional functioning," "somewhat below grade level" in reading, and above grade level in math. (*Id.*).  Accordingly, the report found that D.G. was "capable of close to grade level school work with some remedial help and support." (*Id.*).

On May 4, 2012, DOE School Psychologist Oksana Kravchenko conducted an observation of D.G. in her first-grade ICT classroom. (IHO Ex. 2). Ms. Kravchenko observed that D.G. was well-behaved in class, attentively listened to a story being read by the teacher, raised her hand to participate in class, and gave responsive answers to the teacher's questions. (*Id.*).[6]

A few days prior to D.G.'s IEP meeting for the 2012-2013 school year, DOE Supervisor of School Psychologists Ester Gutwein observed D.G. in an English/Language Arts ("ELA") lesson and a math lesson. (Tr. 25-26, 29). During the ELA lesson, all 25 students were present in the ICT classroom, while only about 10 students were present for D.G.'s math lesson, the others having either left with therapy providers or formed another group in the back of the room for a different lesson. (*Id.* at 30).  Ms. Gutwein observed that D.G.

---

[6]    Plaintiffs have attempted to devalue the DOE's classroom observations by taking D.G.'s classroom participation out of context.  Specifically, Plaintiffs dismissively describe D.G.'s contribution as having "raised her hand and called out two words, one of which[,] 'ami,' is not even a recognized word." (Pl. Opp. 17).  Review of the full classroom observation report reveals that such a characterization is disingenuous.  The story the teacher was reading was "Fancy Nancy and the Boy from Paris." (*See* IHO Ex. 2).  She asked the students to raise their hands and name a word from the story that they found "fancy."  D.G. raised her hands twice to give words, one of which was indeed "ami" — the French word for "friend."  *See* Ami, LaRousse French-English Dictionary, http://www.larousse.com/en/dictionaries/french-english/ami/2843 (last visited Feb. 24, 2015).  It is not surprising that an English-speaking first-grader would find a French word "fancy."  Such participation supports Ms. Kravchenko's observation that D.G. was "very engaged" with the material. (IHO Ex. 2).

was "extremely attentive" and "focused on the lesson at all times." (*Id.* at 31).
During the ELA lesson, in response to "inferential questions about the story"
that the teacher read to the class, D.G. gave "really very good answers that
were completely and totally on target." (*Id.*). When the class shifted to the
math lesson, D.G. remained focused and attentive. (*Id.*). While she did answer
some of the math questions incorrectly, that did not discourage her from being
"completely involved." (*Id.* at 31-32). Ms. Gutwein testified that during her
observation, D.G. was "smiling," and she was a "very lively, eager, active
participant in that classroom situation." (*Id.* at 32). Ms. Gutwein observed
that D.G. "fit right into that classroom" and her participation "compared
favorably" to her classmates both socially and academically. (*Id.* at 33-36).

## C.    D.G.'s 2012-2013 IEP

### 1.    The May 9, 2012 CSE Meeting

On May 9, 2012, the CSE convened to develop D.G.'s IEP for the 2012-
2013 school year. (*See* IHO Ex. H). Participants at the IEP meeting consisted
of Ms. Gutwein, Ms. Kravchenko, D.G.'s special education teacher, her general
education teacher, her speech therapist, her occupational therapist, her
mother R.G., R.G.'s attorney Diana Gersten, a DOE social worker, the
principal, the assistant principal, and a parent member by telephone. (Tr. 306,
353; *see also* IHO Ex. H at 14). Prior to the meeting, Ms. Gutwein had spoken
to the assistant principal and Ms. Kravchenko. They informed Ms. Gutwein
that there may be "tension" at the meeting because D.G.'s mother wanted to
send D.G. to the Churchill School, and would be bringing an attorney to assist

her in achieving that placement.  (*Id.* at 37, 63, 82-84; *see* IHO Ex. G).  In preparation for this meeting, Ms. Gutwein testified that she reviewed the BLC Report, the BLC Addendum, the DOE Update, a sample of D.G.'s work, and D.G.'s occupational therapist's report.  (Tr. 37-38).

The May 9, 2012 meeting lasted two hours.  (Tr. 349).  Attendees came to the meeting with a draft IEP that had been created with input from several individuals, including D.G.'s school psychologist, the occupational and speech therapists, and the teachers.  (*Id.* at 55).  At the beginning of the meeting, according to Ms. Gersten, Ms. Gutwein noted that the recommended placement would likely be continued instruction in an ICT classroom.  (*Id.* at 353-54).  During the meeting, the draft was enlarged on a screen, and the participants discussed each section and inserted additional information.  (*Id.* at 52, 345, 355).

R.G. made several contributions to the document.  (Tr. 56-61, 355).  For example, Ms. Gutwein recalled that R.G. requested that the IEP recommend scribe services for D.G., and added language to the section describing D.G.'s management needs regarding scribe services.  (*Id.* at 56; IHO Ex. H at 3).  In several sections, she added her concerns as a parent about D.G.'s needs. (Tr. 59; IHO Ex. H at 2-3).  R.G. also voiced her concern with a math-related goal in the goals section of the draft IEP, and requested to follow up after the meeting with her preferred language for that goal.  (Tr. 59, 308, 355).

During the course of the meeting, R.G. also made known her desire that D.G. be placed in the Churchill School, and complained that she did not feel

13

that they were taking her wishes into account.  (Tr. 64).  D.G.'s teachers and therapists reiterated that D.G. was doing well and making progress, and that a more restrictive, non-mainstream environment would do her a disservice.  (*Id.* at 64; *see also* IHO Ex. H at 1-3).  The therapists' observations of D.G.'s aptitudes and weaknesses were memorialized in the May 9, 2012 IEP.  (*See generally* IHO Ex. H).

At the end of the meeting, R.G. requested that the IEP not be finalized, in particular because she wanted time to review the IEP with a teacher in another school and possibly modify and add some goals.  (Tr. 45-46, 307-09; *see also* IHO Ex. I).  The DOE honored R.G.'s request, and did not finalize the IEP. (Tr. 46; *see also* Pl. Br. 3).

The May 9 CSE determined that D.G. was eligible for special education and related services as a student with a speech and language impairment, and recommended an ICT classroom with related services of speech-language therapy and occupational therapy.  (IHO Ex. H at 1, 8).

### 2.    The May 23, 2012 CSE Meeting

The CSE reconvened on May 23, 2012, at R.G.'s request.  (Tr. 46, 310-11).  R.G. sought review both of D.G.'s disability classification and of the recommendation contained in the May 9 IEP.  (*Id.* at 70, 310, 312).  The participants at this meeting were largely the same as at the May 9, 2012 meeting, although Ms. Gutwein did not attend because she was unavailable. (*Id.* at 78, 311; *see also* IHO Ex. K at 15).  At this meeting, although there was no new evaluation, R.G. requested that D.G.'s disability classification be

modified from "speech and language impairment" to "learning disability," and it was.  (Tr. 42, 66-67; *see also id.* at 310, 312; *compare* IHO Ex. H at 1 *with* IHO Ex. K at 1).  The CSE also modified the recommendation contained in D.G.'s IEP to a special education classroom with a maximum of 12 students, one special education teacher, and one classroom paraprofessional (a "12:1:1" class), plus related speech-language and occupational therapy.  (IHO Ex. K at 1, 8; Tr. 67, 312).[7]

After the May 23, 2012 meeting, Plaintiffs received a Final Notice of Recommendation ("FNR") from the DOE that recommended the 12:1:1 placement at P.S. 52.  (Tr. 312-13).  R.G. then went to view both the kindergarten-first grade combined classroom and the second grade classroom of the 12:1:1 classes at P.S. 52.  (*Id.* at 313).  R.G. did not feel the classes were appropriate for D.G. because they were too noisy, too heavily staffed, not socially appropriate, and contained students who were classified as much more disabled than D.G.  (*Id.* at 313-14, 337).  Afterwards, when R.G. discussed her reservations with the assistant principal, the assistant principal tried to explain that keeping D.G. in an ICT classroom was the most appropriate

---

[7]     Ms. Gutwein understood from those that attended the meeting that this was an accommodation of R.G.'s desire for a more restrictive recommendation.  (Tr. 67, 69-70; *see also id.* at 312).  And, indeed, this more restrictive recommendation came on the heels of R.G.'s letter to the DOE expressing her desire to elevate D.G.'s disability classification and her disagreement with D.G.'s continued placement in an ICT classroom.  (IHO Ex. I).  Plaintiffs, however, dispute this assertion, pointing to the fact that the more restrictive May 23, 2012 IEP explicitly notes that the mother "disagrees with CSE's program recommendation."  (IHO Ex. K at 13).  While these two characterizations are not mutually exclusive (i.e., R.G. could disagree with an attempted accommodation), resolving this particular dispute is not necessary to the resolution of the pending motions.

placement. (*Id.* at 314). R.G. wrote a letter to the DOE, rejecting the 12:1:1 placement at P.S. 52 and requesting that the CSE consider a non-public school — like the Churchill school in which she had already enrolled her daughter for the coming school year — for D.G. (*Id.* at 315; IHO Ex. L).

### 3. The July 10, 2012 CSE Meeting

In response to R.G.'s rejection of the May 23, 2012 IEP recommendation, the DOE arranged for a third CSE meeting on July 10, 2012, to discuss D.G.'s IEP for the upcoming school year. (Tr. 315-16; *see also id.* at 109). The participants differed from the two May meetings, and included DOE psychologist Marie Bastien, a DOE social worker, a general education teacher, a special education teacher,[8] a parent member, R.G., and R.G.'s attorney Ms. Gersten. (IHO Ex. M at 18; Tr. 319, 358). Prior to the meeting, Ms. Gutwein spoke to the DOE members of the CSE. (Tr. 71).[9] Ms. Bastien testified that in preparation for the meeting, she reviewed the BLC Report, the DOE Update, the classroom observation, the occupational therapist's report, and the previously drafted IEPs. (Tr. 110, 126). Ms. Bastien also prepared a draft IEP, but the recommendation and other sections were left blank. (*Id.* at 135-36).

---

[8]     These were not D.G.'s teachers, but were simply other teachers employed by the DOE. These circumstances are discussed further below at note 16.

[9]     Ms. Gutwein testified that this contact occurred in order to advise the CSE team to review the materials and that the assistant principal would be in the building at the time of the meeting if they needed anything. (Tr. 71). Plaintiffs suggest that this call was made in order to persuade the DOE CSE team members to return to the ICT recommendation, citing the mere fact that the July 2012 CSE did return to that recommendation. (*See* Pl. Br. 3-4 n.3; Pl. Opp. 12). Such speculation is an inadequate basis for the Court to discredit Ms. Gutwein's testimony.

The July 10, 2012 meeting lasted about two hours.  (Tr. 128).  The team discussed D.G.'s academic performance levels at length, and incorporated more of R.G.'s concerns into the IEP.  (*Id.* at 118-19, 127; *see also* IHO Ex. M at 16). Ms. Bastien testified that R.G. "participated thoroughly" in the CSE meeting, and that she "had a lot to say, and she made her point."  (Tr. 128).  The group discussed R.G.'s general desire for a smaller setting than an ICT class for D.G., as well as her more specific desire to place D.G. in a non-public school.  (*Id.* at 131).  Ms. Bastien testified that they also discussed the DOE's position that a smaller setting was not appropriate because, based on D.G.'s cognitive and academic profile, and on her participation and functioning in the class, the ICT classroom with two teachers was a "perfect fit"  (*id.* at 130-32), while a smaller class would be too restrictive (*id.* at 132).

Following this meeting, the CSE prepared a third IEP, which incorporated much of the content from the previous two IEPs and built on them further.  (Tr. 144).  The July 2012 IEP recommended placement in a larger ICT class, with special education teacher support services ("SETSS") for reading and writing twice a week in the ICT classroom and twice a week outside the classroom, SETSS for math once a week in the classroom, occupational therapy, and speech-language therapy.  (IHO Ex. M at 10-11; Tr. 128-29).

**D.    D.G.'s Parents' Second Rejection of the IEP and D.G.'s Enrollment at the Churchill School**

On July 12, 2012, R.G. wrote the DOE and rejected the July 10, 2012 IEP.  (IHO Ex. N).  The DOE informed Plaintiffs that the July 2012 IEP was the

final IEP for the 2012-2013 school year.  (IHO Ex. A at 2; Tr. 320).  On August 22, 2012, R.G.'s attorney wrote the DOE, informing it that D.G.'s parents intended to enroll D.G. at the Churchill School for the 2012-2013 school year, and alleging that procedural and substantive errors in the development of D.G.'s IEP amounted to denial of a FAPE.  (IHO Ex. A at 1).  On October 9, 2012, after D.G. had already begun at Churchill, R.G. again wrote the DOE requesting another IEP meeting.  (IHO Ex. O).

On November 19, 2012, the parents' attorneys wrote the DOE, requesting an Impartial Hearing and seeking $46,000 in reimbursement from the DOE for the cost of the Churchill School's tuition for the 2012-2013 school year.  (IHO Ex. B).  This November 19, 2012 letter set forth in detail the parents' issues with each of the three IEP recommendations for the 2012-2013 school year, alleging that: (i) the substance of each placement was inappropriate for D.G.; (ii) R.G.'s input was ignored and she was denied an opportunity to participate in the final July 2012 IEP meeting; (iii) the July 2012 CSE had impermissibly predetermined its recommendation; (iv) the July 2012 CSE had ignored critical evaluations and documents; (v) the July 2012 CSE had failed to consider all DOE programs available; and (vi) the three different IEP recommendations within a two-month period were evidence of the CSE's shortcomings.  (*Id.* at 2-4).  The DOE provided a due process response on December 4, 2012.  (IHO Ex. C).

**E.     The Impartial Hearing**

**1.     The Hearings**

In response to Plaintiffs' request, the IHO held evidentiary hearings on

June 25, 2013, July 2, 2013, and August 5, 2013.  (*See* Tr. 1, 159, 366).

During the hearings, the parties offered documentary and testimonial proof to

establish and defend their cases.  The witnesses who testified on behalf of the

parents included R.G.; Amy Margolis, a neuropsychologist at the BLC; Larissa

Pawliw, D.G.'s teacher at the Churchill School; Wendy Federico, the Director of

Admissions at Churchill; and Diana Gersten, R.G.'s attorney.  Ms. Gutwein, the

DOE Supervisor of School Psychologists who was present at the May 9, 2012

IEP meeting, and Ms. Bastien, the DOE School Psychologist who participated in

the July 10, 2012 IEP meeting, testified on behalf of the DOE.

**2.     The IHO's Opinion**

On August 20, 2013, the IHO issued a decision finding that the DOE had

failed to offer D.G. a FAPE for the 2012-2013 school year, and awarded

Plaintiffs reimbursement for the cost of the Churchill tuition.  (IHO Op. 17).

The decision contained 14 pages of substantive opinion in 1.5-line-spaced type,

of which nearly three pages contained a recitation of the relevant legal

standards.

The IHO spent much of the opinion describing the content of the

documentary evidence and the testimony of the parties' witnesses, and

considerably less space analyzing that evidence.  In reviewing the evidence

surrounding the three CSE meetings held to develop D.G.'s IEP for 2012-2013,

the IHO correctly noted that it was only the final IEP of July 10, 2012, that was under review.  After describing the testimony, the IHO properly identified the governing law, and set forth the test applicable in reimbursement cases:

> Boards of Education may be required to pay for educational services obtained for a child by the child's parent, if [i] the services offered by the Board of Education were inadequate or inappropriate; [ii] the services selected by the parents were appropriate[;] and [iii] equitable considerations support the parents' claim.

(IHO Op. 7 (quoting *Sch. Comm. of the Town of Burlington* v. *Dep't of Educ. of Mass.*, 471 U.S. 359 (1985))).[10]  The IHO then found that the 2012-2013 IEP was not reasonably calculated to provide D.G. with educational benefits, and thus that the DOE had not met its burden of demonstrating that it had provided D.G. with a FAPE for the 2012-2013 school year (i.e., that the first *Burlington-Carter* element was satisfied).  (IHO Op. 13).

First, the IHO found that the July 2012 CSE erroneously relied on the DOE Update to determine that "Student was but a few months behind in her Reading and Writing [] and could adequately function in an Integrated Co-Teaching Classroom."  (IHO Op. 12).  The IHO ascribed the "significant differences" in D.G.'s performances on reading and writing skills from the April 2012 BLC Addendum and the May 2012 DOE Update to D.G.'s familiarity with the particular sub-test used.  (*Id.* at 5, 12).  As further support, the IHO cited D.G.'s reading grades on her first grade (2011-2012) report card.  (IHO Op. 13).  Specifically, the IHO noted that her overall reading grade was "1," or "Far below

---

[10]   "This framework is known as the *Burlington-Carter* test."  *R.E.*, 694 F.3d at 185; *see generally Walczak,* 142 F.3d at 129 (collecting cases).

grade level standards," as were her grades in three of the four reading
subcategories.  (*Id.*).[11]  The IHO did not cite to any other evidence to support
this finding.

Next, the IHO determined that, contrary to the direct testimony of DOE
witness Bastien, the DOE CSE members did not sufficiently review the
privately-obtained Fall 2012 BLC Report and the April 2012 BLC Addendum
prior to or during the July 10, 2012 CSE meeting.  (IHO Op. 12).  He made this
determination on the basis that he "accept[ed] as accurate" the testimony of
R.G.'s attorney Gersten that when the reports were raised, Ms. Bastien "had no
idea of what the reports had stated and had to go to a computer, access the []
records and print out a copy of those reports."  (*Id.* (citing Tr. 362)).  He also
cited in support of this finding the fact that, at the impartial hearing, Ms.
Bastien could not remember specific questions from Ms. Gersten about the
reports at the July 2012 CSE meeting and could not recall whether she printed
the reports out.  (*Id.* at 12-13).  As it concerns Ms. Bastien's and Ms. Gersten's
testimony, the IHO further stated, "Also, while Witness Bastien stated
unequivocally that the team had not predetermined its recommended

---

11    The 2011-2012 report card listed grades on the following scale: 4, Exceeds grade-level
      standards; 3, Meets grade-level standards; 2, Approaches grade-level standards; and 1,
      Far below grade-level standards.  (IHO Ex. Q at 1).

      In making this finding, the IHO mistakenly noted that D.G.'s reading grade was "1" for
      "each of the *three* marking periods."  (IHO Op. 13 (emphasis added)).  This is incorrect.
      D.G. received a grade of "2" overall and in each subcategory for the first marking period.
      (IHO Ex. Q at 2).  For the two subsequent periods, she received "1"s overall and in three
      of the four subcategories (shows evidence of understanding the text, recognizes a
      growing number of frequently used words, and uses regular letter/sound relationships
      to figure out new words) and "3"s in the remaining subcategory (chooses appropriate
      books and reads independently).  (*Id.*).

placement, Witness Gersten stated that, at the beginning of the meeting, the District Representative stated at the start of the meeting that Student should be in an Integrated Co-Teaching Class." (*Id.* at 13 (citing Tr. 128, 159)).

Finally, the IHO accepted as accurate the findings of the BLC Report and its recommendations, including that D.G. "had significant deficits that could not be adequately addressed in an Integrated Co-Teaching Classroom and that [D.G.] would require a special education placement with a high teacher/student ratio in a small classroom with teachers trained to teach children with language and visual processing disabilities." (*Id.* at 13). The IHO did not, however, elaborate on the reasons why he found this report accurate. Based on these findings, the IHO determined that the DOE had failed to meet its burden of establishing that it had provided D.G. with a FAPE for the 2012-2013 school year. (*Id.*).

As for the remaining elements of the *Burlington-Carter* test, the IHO went on to find that the Churchill School was an appropriate placement for D.G. for the 2012-2013 school year, and that the parents were entitled to reimbursement for the tuition paid to the Churchill School for that year, in the amount of $46,000.00.

## F.   The SRO Appeal

The DOE thereafter appealed the IHO's decision to the SRO. In particular, the DOE requested that the SRO reverse the IHO's determinations that Defendant had failed to offer D.G. a FAPE for the 2012-2013 school year; that the Churchill School was an appropriate placement; and that the equities

favored the parents.  (SRO Op. 5).  As it concerns whether the DOE offered

D.G. a FAPE, the DOE argued that: (i) the July 2012 CSE reviewed the private

BLC evaluations, as well as other evaluative information, to assess D.G.'s

needs and make its recommendation, and that the IHO erred in not crediting

Ms. Bastien's testimony to that effect; (ii) the IHO erred to the extent that he

implied that the DOE predetermined its July 2012 IEP recommendations;

(iii) although not addressed by the IHO, D.G.'s parents actively participated in

the development of her IEP; (iv) the DOE was not required to consider other

programs because the July 2012 recommendation was reasonably calculated to

enable D.G. to receive educational benefits and constituted the least restrictive

environment for her; and (v) the recommendation of an ICT classroom with

SETSS offered D.G. a FAPE.  (*Id.*).

### 1.   The SRO's Findings of Active Parental Participation and No Predetermination

On October 21, 2013, the SRO rendered a decision finding that the DOE

had in fact provided D.G. with a FAPE for the 2012-2013 school year.  The

decision was set out in almost 20 pages of single-spaced text, of which

approximately four pages recited the relevant legal standards.  After setting

forth those standards, the SRO considered the parties' arguments concerning

parent participation and predetermination.  The SRO found that the hearing

record reflected meaningful and active parental participation in the

development of the final July 2012 IEP (SRO Op. 9), and then walked through

the record evidence supporting that finding.

23

First, the SRO determined that D.G.'s parents participated actively and meaningfully in the development of an IEP that would address D.G.'s needs. (SRO Op. 10).  Commenting that the July 2012 CSE meeting could not be examined in isolation in view of the record, the SRO noted that all three CSE meetings were convened in response to specific parental requests, and that the parents' concerns set forth in those requests were considered and addressed at those meetings.  (*Id.* at 9).  For example, the SRO described R.G.'s significant input in the May 9, 2012 IEP in the section regarding D.G.'s management needs, including the provision of a scribe (*id.* (citing Tr. 56-57; IHO Ex. H)), and pointed out that R.G. requested and received the opportunity to consult with a colleague of hers on the language of the goals in that IEP (*id.* (citing Tr. 45, 66, 308-10; IHO Ex. I)).  Consistent with her request, R.G. sent a letter with revised language, which was included in the May 23, 2012 IEP.  (*Id.* at 9-10 (citing IHO Ex. I, K)).

The SRO noted that R.G.'s attorney Ms. Gersten testified that the May 23, 2012 CSE meeting was smaller, "less intense," and "more collaborative." (SRO Op. 9 (citing Tr. 357)).  The May 23, 2012 CSE also acceded to R.G.'s requests for D.G.'s eligibility classification to be modified to "learning disability" and for a more restrictive class placement.  (*Id.* at 10 (citing IHO Ex. I, K)).  As it concerns the July 2012 CSE meeting, the SRO pointed both to Ms. Bastien's testimony that D.G.'s parents "participated thoroughly" (*id.* at 9 (citing Tr. 128)), and to Ms. Gersten's testimony that D.G.'s annual goals were discussed "piece by piece" at the meeting (*id.* at 10 (citing Tr. 355)).  He

24

observed that R.G.'s changes included in the May 23, 2012 IEP were carried over to the July 2012 IEP, and that D.G.'s parents requested another goal be added to the July 2012 IEP (which it was).  (*Id.* at 10).  The SRO also credited Ms. Bastien's testimony that the addition of SETSS to D.G.'s recommendation was made in response to her parents' concerns about D.G.'s ability to work in large groups and her delays in reading and writing.  (*Id.* (citing Tr. 129-30)).

Second, the SRO found that, contrary to the IHO's determination, the hearing record showed that the CSE sufficiently considered the privately-obtained BLC evaluations.  (SRO Op. 10).  The IHO had discredited Ms. Bastien's testimony that she had reviewed the reports before the CSE meeting as "unworthy of belief," and had credited the testimony of R.G. and Ms. Gersten that Ms. Bastien appeared unaware that the BLC Report existed and had printed it and reviewed it during the meeting.  (*Id.* at 10 & n.5).  The SRO noted his obligation to give deference to the credibility findings of the IHO "unless non-testimonial evidence in the hearing record, read in its entirety, compels a contrary conclusion."  (*Id.* at 10-11 (citing cases)).

The SRO found that the documents compelled such a contrary conclusion, especially where the IHO offered only his perfunctory assessment that Ms. Bastien's testimony was "unworthy of belief" with no explanation.  (*Id.* at 11).[12]  Specifically, the SRO observed that the July 2012 IEP explicitly cited the BLC Report.  (*Id.* (citing IHO Ex. M at 2)).  He further noted that both May

---

[12]     As discussed in greater detail below, the IHO set forth the testimony he found credible and incredible from each witness; he did not explain, as the SRO noted, why he found one witness's testimony more believable than the other.

CSEs reviewed the BLC evaluations; that descriptions of D.G. based on those evaluations were incorporated in the May 23, 2012 IEP; and that those descriptions were in turn carried over into the July 2012 IEP. (*Id.* (citing Tr. 37-38; IHO Ex. K at 1)). In any event, the SRO found, while the CSE had an obligation to consider private evaluations, there was no requirement that the CSE have substantive discussions about them at the CSE meeting. (*Id.* (citing cases)).

Finally, the SRO determined that the July 2012 IEP recommendation was not predetermined, and that any proposed recommendations were made with the understanding that changes would be made to the IEP at the CSE meeting. (SRO Op. 11-12). In reaching this determination, the SRO pointed to abundant evidence on the record, including the facts that: (i) the July 2012 CSE lasted for two or more hours (*id.* at 11 (citing Tr. 128)); (ii) while Ms. Bastien testified that she engaged in preparatory activities and came prepared with a draft, the program recommendations and other portions of the IEP were completed at the meeting (*id.* (citing Tr. 135-36, 137, 154-55)); and (iii) CSE participants discussed, and the IEP reflected that they discussed, the parents' preference for a smaller classroom and private school in addition to other placement options (*id.* (citing Tr. 130-31, 137; IHO Ex. M at 16)). The SRO thus determined that the parents had been given adequate opportunity to participate in the drafting of the IEP and that the recommendations contained in the July 2012 IEP were not predetermined by the DOE CSE members.

### 2. The SRO's Finding That the Evaluative Data Supported the Ultimate Program Recommendation

The SRO then considered D.G.'s parents' arguments that the July 2012 IEP's recommendation was not supported by the available evaluative information.  In doing so, the SRO first set forth what the CSE must consider under the law in terms of evaluative information.  (SRO Op. 12 (citing 34 C.F.R. § 300.324(a); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(d)(2))).  He then recounted in considerable detail the contents of each evaluation, private and DOE-sponsored, that the CSE considered.  (*Id.* at 12-14 (citing Tr. 109-10, 126; IHO Ex. 1, 2, D, E, F)).  The SRO acknowledged the IHO's finding that D.G.'s improvement on one particular subtest of the May 2012 DOE Update could be attributed to her "familiarity with the test," having just taken that subtest in the April 2012 BLC Addendum.  (*Id.* at 14 (citing IHO Op. 6)).  However, the SRO found that even if one disregarded this subtest completely, the July 2012 IEP recommendation was appropriate in light of all of the remaining evaluative materials available to the CSE.  (*Id.*).  Thus, the SRO held, the July 2012 CSE had properly considered those materials.

### 3. The SRO's Finding That the July 2012 IEP Recommendation Provided a FAPE

The SRO next turned to the IHO's finding, and D.G.'s parents' arguments, that the July IEP's provisions for an ICT classroom with SETSS in math and English-Language Arts did not provide D.G. with a FAPE.  (SRO Op. 14).  First, the SRO addressed the argument that D.G. had failed to make progress in an ICT class during the 2011-2012 school year.  (*Id.* at 15).  In

identifying the relevant legal standards, he explained that, while progress under a prior IEP is a relevant inquiry, especially if parents express concern about the rate of progress, the fact that a student has not made progress under a particular IEP does not automatically render that IEP inappropriate, nor does the fact that a particular IEP is similar to a past IEP, so long as the particular IEP is based on consideration of the student's needs at the time it is formulated.  (*Id.* (citing cases)).

While acknowledging that a mere copy of an IEP under which a student had previously failed to make any progress would likely not be appropriate (SRO Op. 15 (citing cases)), the SRO found that the record demonstrated that: (i) there were distinct differences between the old IEP and the July 2012 IEP, because the July 2012 IEP added services like SETSS and occupational therapy in consideration of D.G.'s needs; and (ii) D.G. did, in fact, make progress under the old IEP, based on a detailed review of her report cards, classroom observations, and evaluative test results  (*id.* at 15-17).  In particular, the SRO noted that the record reflected that the delays D.G. experienced during the 2011-2012 school year were largely in reading and writing, and acknowledged that she remained below grade level in those areas. Nonetheless, he found that the record demonstrated a clear pattern of improvement over the course of her first-grade year, thus exhibiting progress. (*Id.* at 16 & n.9).  The SRO found that the addition of SETSS and ELA services to D.G.'s July 2012 IEP, as well as a change in promotion criteria, appropriately addressed her delays in these areas.  (*Id.* at 17).

28

In reviewing the psychologists' opinions, the SRO determined that the DOE and private experts differed on *how* beneficial the ICT placement (with SETSS services, therapy, and a scribe) was, but even the private neuropsychologist responsible for the BLC Report acknowledged that D.G. was receiving benefits from the ICT arrangement.  (SRO Op. 16-19 (citing IHO Ex. D at 12; Tr. 64, 149, 200)).  And it was the DOE psychologists' belief, based on both observations and evaluative data, that the ICT classroom was the best fit for D.G.  (*Id.* at 17).  The SRO noted that, under the law, the DOE needed only to consider the parents' privately obtained evaluations; it was under no obligation to adopt their recommendations wholesale, over the recommendations of its own psychologists.  (*Id.* at 18 (citing cases)).  Just because a student may make greater academic progress in a more restrictive academic setting, the SRO found, does not dictate the conclusion that a less restrictive setting is inappropriate under the IDEA.  (*Id.* at 19 (citing cases)).  Moreover, the SRO explained, the DOE was not required to consider moving D.G. to a private school if it believed that D.G. could be appropriately educated in a public school; the IDEA views private school as a last resort, regardless of parent preferences.  (*Id.*).

Finally, the SRO concluded:

> The July 2012 IEP also provided additional supports to the student by recommending strategies aligned to the student's needs, including: repetition of instructions and directions; provision of adequate time to express her verbal options during classroom activities; further instruction after completion of a task; and provision of reminders to revise her work before submitting it.

> Additionally, consistent with the [BLC Report], the July 2012 IEP recommended that the student be provided a scribe on a trial basis.  The July 2012 IEP also provided for speech-language therapy to address the student's language deficits and OT to target the student's motor integration difficulties.  The July 2012 CSE also included many goals on the IEP that were aligned to the student's needs, were specific and measurable, and comprehensively addressed the areas of reading, math, and writing, as well as multiple OT and speech-language therapy related functions, and auditory processing functions.  Thus, the totality of the July 2012 IEP offered the student an appropriate special education program designed to meet the student's needs.

(SRO Op. 19-20).  Based on these findings, the SRO reversed the IHO's determination that the DOE failed to offer D.G. a FAPE for the 2012-2013 school year because such a determination was not supported by the hearing record.  (*Id.* at 20).  The SRO accordingly declined to reach the issues of whether the Churchill School was an appropriate placement or whether equitable considerations support D.G.'s parents' claim.  (*Id.*).

## G.   The Instant Litigation

On February 21, 2014, having exhausted their administrative remedies as required, Plaintiffs filed the Complaint in this action.  (Dkt. #2).  On June 5, 2014, Plaintiffs filed a motion for summary judgment.  (Dkt. #11).  On July 16, 2014, Defendant filed its Cross-Motion for Summary Judgment.  (Dkt. #18).  By September 5, 2014, both motions were fully briefed.  (Dkt. #11-12, 18-21).

## DISCUSSION

### A.   The Standard of Review

In IDEA cases, motions for summary judgment "serve as an aid to the court within a statutory scheme whose purpose is to ensure that children with disabilities receive the educational benefits to which they are entitled." *T.Y.*, 584 F.3d at 418.  For this reason, motions for summary judgment in IDEA cases are "an appeal from an administrative determination" that typically "triggers more than an inquiry into possible disputed issues of fact." *Lillbask*, 397 F.3d at 84 n.3 (citations omitted).

The federal court's role in reviewing these state administrative decisions is, however, "circumscribed." *R.E.*, 694 F.3d at 189; *see also T.Y.*, 584 F.3d at 417.  A federal court must give "due weight to the state proceedings, mindful that [the court] lack[s] the specialized knowledge and experience necessary to resolve questions of educational policy." *R.E.*, 694 F.3d at 189 (citation and quotation marks omitted).  "Keeping in mind this circumscribed role, the district court engages in an independent review of the administrative record and makes a determination based on a preponderance of the evidence." *M.B. ex rel. L.C.* v. *Minisink Valley Cent. Sch. Dist.*, 523 F. App'x 76, 77-78 (2d Cir. 2013) (summary order) (quoting *Gagliardo*, 489 F.3d at 112).  Although the court's review of state administrative decisions "requires a more critical appraisal of the agency determination than clear-error review, [it] nevertheless falls well short of complete *de novo* review." *M.H.* v. *N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012) (citation omitted).  District courts may not

"substitute their own notions of sound educational policy for those of the school authorities which they review." *K.Y. ex rel. T.Y.* v. *N.Y.C. Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009) (citation omitted).

As relevant here, "[c]ourts generally defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer." *M.H.*, 685 F.3d at 241 (citing *A.C. ex rel. M.C.* v. *Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009)).  Where the IHO and SRO reach competing determinations, courts "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *R.E.*, 694 F.3d at 189.

The deference owed to an SRO's decision depends on the quality of that opinion.  *R.E.*, 694 F.3d at 189.  "Deference is particularly appropriate when the state hearing officer's review has been thorough and careful." *Id.* at 184 (citing *Walczak*, 142 F.3d at 129).  In reviewing the administrative decision, a district court is directed to asses "the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarly with the evidence and the witnesses than the reviewing court." *Id.* at 189 (citation and quotation marks omitted).

Judicial review under the IDEA is a "two-part inquiry":

> First, the court asks whether the State complied with the procedures set forth in the Act.  Second, the court asks whether the IEP developed through the Act's

32

> procedures is reasonably calculated to enable the child
> to receive educational benefits. If an IEP is
> deficient — either procedurally or substantively — the
> court then asks whether the private schooling obtained
> by the parents for the child is appropriate to the child's
> needs.

*M.H.*, 685 F.3d at 245 (citations omitted). In assessing this last question,

"equitable considerations relating to the reasonableness of the action taken by

the parents are relevant." *Id.*

## B.    Analysis

The SRO's decision reflects a thorough review of the record and of the

parties' arguments in assessing whether the 2012-2013 IEP was reasonably

calculated to enable D.G. to receive educational benefits. Consequent to this

review, the SRO reached a well-reasoned conclusion that the 2012-2013 IEP

was substantively and procedurally sound, which conclusion is entitled to the

utmost deference. *R.E.*, 694 F.3d at 184 ("Deference is particularly appropriate

when, as here, the state hearing officers' review has been thorough and

careful." (citing *Walczak*, 142 F.3d at 129)).

In contrast, a review of the IHO Opinion demonstrates that it does not

warrant deference from the Court, especially when compared to the analytically

intensive opinion rendered by the SRO. Put simply, the IHO Opinion is long in

its recitation of the testimonial evidence, and short (in the Court's estimation,

unduly short) in its analysis of the issues presented.[13]  Accordingly, while the

---

[13]    Indeed, barely two pages of the 14-page opinion are devoted to analysis of the issue of whether the 2012-2013 IEP was reasonably calculated to provide D.G. with educational benefits, and, as noted below, the IHO did not even address the issues of predetermination and parental participation.

Court has undertaken its own detailed review of the record, it appropriately accords deference to the sound opinion of the SRO.

### 1. The 2012-2013 IEP Complied with the IDEA's Procedural Requirements

Despite Plaintiffs' contentions to the contrary, the CSE that developed the July 2012 IEP for D.G.'s 2012-2013 academic year complied with IDEA's procedural requirements: it both considered the evaluative reports and assessments available to it, and permitted D.G.'s parents ample opportunity to participate in the decision-making process.

"The initial procedural inquiry in an IDEA case is no mere formality, as adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *T.P. ex rel. S.P.* v. *Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 253-54 (2d Cir. 2009). At the same time, not every procedural error will render an IEP inadequate. *M.H.*, 685 F.3d at 245. Instead, "[r]elief is warranted only if the alleged procedural inadequacies impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a FAPE to the parents' child, or caused a deprivation of educational benefits." *Id.* When determining whether a district complied with the IDEA's procedural requirements, the court must focus on whether the parents "had an adequate opportunity to participate in the development" of their child's IEP. *Cerra* v. *Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005).

In support of their argument that the July 2012 CSE did not properly consider the private evaluative reports before it, Plaintiffs assert that the SRO incorrectly discounted the IHO's credibility findings, and inappropriately found that the BLC evaluations were considered by the July 2012 CSE. (Pl. Br. 11-15). Plaintiffs' argument is unavailing. As the SRO notes, the IHO's credibility finding was made with only a cursory recitation of testimony (*see* SRO Op. 11), and the non-testimonial evidence on the record compelled the conclusion that the CSE considered the BLC evaluations (*id.* at 10-12).

Without stating why he believed the testimony of certain witnesses over others, the IHO credited Ms. Gersten's and R.G.'s testimony, and discredited Ms. Bastien's testimony. (IHO Op. 12). Specifically, the IHO credited Ms. Gersten's and R.G.'s testimony that they believed Ms. Bastien had not reviewed the BLC Report before the July 2012 meeting because she was "shocked" and "acted surprised" when they mentioned something about the report. (IHO Op. 12-13; Tr. 318, 360-62). He did not credit Ms. Bastien's testimony that she had, in fact, reviewed the BLC evaluations prior to the meeting, and further noted that she could not recall questions from Ms. Gersten's attorney about the evaluations at the July 2012 CSE meeting or recall printing them out. (IHO Op. 12-13).[14]

---

14    The Court notes that Ms. Gersten did not testify as to what questions she asked Ms. Bastien about the report at the July 2012 CSE meeting. Depending on the level of granularity, it may not be surprising that Ms. Bastien did not remember something about the contents of the report.

As the SRO noted, credibility findings by an IHO are accorded deference unless non-testimonial, extrinsic evidence justifies a contrary conclusion.  *See M.W. ex rel. S.W.* v. *N.Y.C. Dep't of Educ.*, 869 F. Supp. 2d 320, 330 (E.D.N.Y. 2012) (citing *Carlisle Area Sch.* v. *Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995)), *aff'd*, 725 F.3d 131 (2d Cir. 2013).  Upon its own review of the record, the Court observes that neither R.G. nor her attorney testified that Ms. Bastien specifically stated that she had not reviewed the BLC evaluations at the July 2012 CSE.  (*See* Tr. 362).  Rather, they testified as to their own personal assumptions as to *why* Ms. Bastien purportedly reacted in a certain way when the BLC evaluations were raised at the meeting.  This rumination does not undermine Ms. Bastien's clear testimony that she had reviewed the document prior to the meeting (Tr. 110), making the IHO's basis for his credibility determination all the more unsupportable.

In any event, the SRO identified clear record evidence that the July 2012 CSE team considered the BLC evaluations: not only did the July 2012 IEP explicitly cite to the BLC Report (IHO Ex. M at 2), but also it incorporated aspects of the two prior May 2012 IEPs (which, in turn, incorporated aspects of the BLC evaluations) (SRO Op. 11).  Additionally, the SRO noted that participants in the CSE discussed the parents' preferences for a smaller classroom and a potential private-school placement, preferences stemming from the recommendations in the BLC Report.  (SRO Op. 11).  Even if some of the CSE participants had viewed the BLC Report and Addendum for the first time at the meeting, the SRO's review of the documentary evidence

36

demonstrates that the private evaluations were properly "considered" as contemplated by the IDEA. *See T.S.* v. *Bd. of Educ. of Town of Ridgefield*, 10 F.3d 87, 89-90 (2d Cir. 1993) (holding that an outside evaluation was appropriately "considered" by the district when it was read at a meeting, but not distributed to CSE members prior to the meeting); *see also id.* at 90 ("[T]he regulatory requirement for [a private evaluation] to be 'considered' by a public agency does not mandate 'that there be substantive discussion' of the [private evaluation]." (citation omitted)).

More fundamentally, as the SRO set forth in detail, the record shows that that D.G.'s parents had ample opportunity to participate in the development of D.G.'s IEP; indeed, her mother was very actively involved.  The July 2012 CSE discussed R.G.'s preferences for a more restrictive, smaller classroom setting, as well as her concerns about D.G.'s performance.  As the SRO described, the CSE made changes to the July 2012 IEP (and those that preceded it, which were incorporated into the July 2012 IEP) at the behest of D.G.'s parents. (SRO Op. 8-10).  D.G.'s parents' and their experts' disagreement with the DOE staff's IEP recommendation does not amount to denial of meaningful participation.  *See P.K. ex rel. P.K.* v. *Bedford Cent. Sch. Dist.*, 569 F. Supp. 2d 371, 383 (S.D.N.Y. 2008) ("The fact that the District staff ultimately disagreed with the opinions of plaintiffs and their outside professionals does not mean that plaintiffs were denied the opportunity to participate in the development of the IEP's, or that the outcomes of the CSE meetings were 'pre-determined.'").  A professional disagreement is not an IDEA violation.  *Id.*; *see also A.M. ex rel.*

*Y.N.* v. *N.Y.C. Dep't of Educ.*, 964 F. Supp. 2d 270, 280 (S.D.N.Y. 2013) ("[A]ll

that is required is a parent's participation, not that the parent have the final

word.").

Finally, the SRO's finding that the IEP recommendations for D.G. were

not predetermined must stand.[15]  The SRO took pains to set forth the record

evidence of the preparatory activities in which the DOE CSE members had

engaged prior to the July 2012 CSE meeting.  (SRO Op. 11-12).  Such activities

do not necessitate a finding of predetermination; indeed, as the SRO also

pointed out, the IDEA specifically permits the DOE staff to engage in

"preparatory activities … to develop a proposal or response to a parent proposal

that will be discussed at a later meeting," as long as it is done with an

understanding that changes may occur at the CSE meeting.  *T.P.*, 554 F.3d at

253 (citing 34 C.F.R. § 300.501(b)(1) & (b)(3))).  The SRO found that the hearing

record "amply show[ed] that the CSE considered multiple options over the

course of several meetings," and, as discussed above, that D.G.'s parents had a

full opportunity to participate in the meetings.  (SRO Op. 12 (citing IHO Ex. H,

---

[15]     Plaintiffs argue that the SRO incorrectly stated that the "IHO did not explicitly make
any findings that the CSE impermissibly predetermined the July 2012 IEP program
recommendation." (*See* Pl. Br. 16; SRO Op. 8).  But the SRO was correct: the IHO did
not make any predetermination finding.  While he contrasted the testimony of two
witnesses in such a way as to imply that he believed one over the other, he made no
findings as to the subject matters of the testimony.  Specifically, the IHO contrasted Ms.
Bastien's testimony that the recommended placement was not predetermined with Ms.
Gersten's testimony that Ms. Bastien had announced a recommended placement at the
beginning of the July 2012 meeting.  (IHO Op. 13).  An announcement at the beginning
of the meeting of the DOE staff's thoughts on a recommendation, while it might be
evidence of pre-determination, does not necessitate such a finding.  *Cf. T.P.*, 554 F.3d at
253 ("[DOE staff's] consideration of educational programs for [student] before the [CSE]
meeting did not violate the procedural requirements of the IDEA.").  More to the point,
the IHO's mere juxtaposition of testimony does not a finding make.

K, M)).  Plaintiffs have provided no basis to overturn this finding.  Accordingly,

the SRO's findings as it concerns the IDEA's procedural requirements are

affirmed.[16]

### 2.   The 2012-2013 IEP Complied with the IDEA's Substantive Requirements

As the SRO found, the July 2012 IEP was reasonably calculated to confer

educational benefits on D.G. and provide her with a FAPE, despite Plaintiffs'

arguments to the contrary.  While, understandably, D.G.'s parents may have

---

[16]   Plaintiffs remark in the introduction of their opening brief that none of the July 2012 CSE members had met or observed D.G., and again make passing note of it in their argument section.  (Pl. Br. 3-4, 20).  These remarks appear as atmospherics in support of Plaintiffs' argument that the July 2012 CSE team failed to consider critical evaluative material; Plaintiffs do not make an independent argument that the July 2012 IEP was procedurally flawed on this basis.  Plaintiffs did not raise this issue in their due process complaint (*see* IHO Ex. B), and neither the IHO (despite Plaintiffs' assertion without citation to the contrary, *see* Pl. Br. 5) nor the SRO addressed it in their respective opinions.  While there was testimony at the hearing from R.G.'s mother that the July 2012 team did not know her daughter (*see* Tr. 319), arguably providing some record for review, the Court declines to advance arguments that Plaintiffs have chosen not to make.

To dispel any doubt, the Court will dispose of the argument here.  That the regular and special education teachers present at the July 2012 CSE were not D.G.'s own teachers could potentially support a procedural violation.  *See* 8 N.Y.C.R.R. § 200.3(a)(1)(iii) (requiring that the CSE team include both a special education and, where applicable, a regular education teacher "of the student"); N.Y. Educ. Law § 4402(1)(b)(1)(a) (same); 20 U.S.C. § 1414(d)(1)(B)(iii) (requiring that the team include a special education and, where applicable, a regular education teacher "of such child").  However, the July 2012 CSE team considered the two prior draft 2012-2013 IEPs in which D.G.'s teachers had participated, and indeed carried over some of that content into the July 2012 IEP.  For this reason, and for the other reasons discussed in this section, any such technical violation did not impede D.G.'s right to a FAPE, did not significantly impede her parents' opportunity to participate in the decision-making process, and did not deprive D.G. of educational benefits.  *See R.B.* v. *N.Y.C. Dep't of Educ.*, 15 F. Supp. 3d 421, 430-31 (S.D.N.Y. 2014) (finding that composition of CSE without student's own special education teacher was technical procedural violation but did not result in denial of a FAPE); *A.M.*, 964 F. Supp. 2d at 279-80 (same); *see also M.H.*, 685 F.3d at 245 (explaining that parents are only entitled to reimbursement for a procedural violation under the IDEA if it impeded child's right to a FAPE, significantly impeded parents' opportunity to participate in the decision-making process, or caused deprivation of educational benefits).

wanted a non-public education at public expense for their daughter, that is not what she is entitled to under the IDEA.

In considering substantive challenges, a court must recognize that an IEP need not provide "every special service necessary to maximize each handicapped child's potential." *Grim* v. *Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003) (citation omitted).  A school district's program must provide "special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." *Walczak*, 142 F.3d at 122 (citations omitted).  An IEP is adequate if it is "likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *T.P.*, 554 F.3d at 254 (citation omitted).

"[I]n order for the district court to conduct an independent review of the sufficiency of an IEP under the IDEA that does not impermissibly meddle in state educational methodology, it must examine the record for objective evidence that indicates whether the child is likely to make progress or regress under the proposed plan." *Gagliardo*, 489 F.3d at 113 (citation and quotation marks omitted).  "[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim*, 346 F.3d at 382.  Indeed, a SRO's decision regarding "the substantive adequacy of an IEP" should be afforded heightened judicial deference, particularly when the court's review "is based entirely on the same evidence as that before the SRO." *M.H.*, 685 F.3d at 244.

The Court's independent review of the record confirms the SRO's decision that the 2012-2013 IEP was reasonably calculated to enable D.G. to receive educational benefits.  The CSE considered ample evidence — evaluative reports, observational data, two prior draft IEPs, and input from those with the most knowledge of D.G.'s academic and social capabilities and needs — to create an appropriate IEP.  The SRO set forth and analyzed this evidence in great detail, and determined that it supported the CSE's July 2012 recommendation.

D.G.'s parents may have hoped or planned that they would receive reimbursement from the DOE for the Churchill School tuition on the basis of the BLC Reports and their own advocacy for their child.  But such advocacy — however impassioned and well-intentioned — does not amount to an entitlement and, more to the point, does not provide a basis to challenge the 2012-2013 IEP.  The IDEA does not entitle a student to the "best education that money can buy."  *Walczak*, 142 F.3d at 130 (quoting *Lunceford* v. *D.C. Bd. of Educ.*, 745 F.2d 1577, 1583 (D.C. Cir. 1984) (Ginsburg, J.)); *see also Antonaccio* v. *Bd. of Educ. of Arlington Cent. Sch. Dist.*, 281 F. Supp. 2d 710, 726 (S.D.N.Y. 2003) ("[T]he IDEA does not require a school district to 'maximize the potential of a handicapped child.'  And it does not require a school district to provide 'everything that might be thought desirable by loving parents.'" (quoting *Rowley*, 458 U.S. at 197 n.21; *Tucker* v. *Bay Shore Union Free Sch. Dist.*, 873 F.2d 563, 567 (2d Cir. 1989))).  Similarly, while the parents might have preferred the Churchill School, such preference does not compel a finding

41

by this Court that the 2012-2013 IEP was defective for the issues addressed at the administrative level.  To the contrary, because the 2012-2013 IEP would have provided D.G. with "an opportunity for meaningful progress," the Court must uphold the SRO's decision.

### 3. The Court Need Not Address the Parents' Unilateral Placement and Equitable Considerations

Plaintiffs maintain that the Churchill School was an appropriate placement for D.G., and that the "equitable factors favor reimbursement" for the tuition the parents paid for D.G. to attend the Churchill School for the 2012-2013 school year.  (Pl. Br. 27-28).  The Court need not reach these issues.

In accordance with the deference owed to state administrative decisions, *M.H.*, 685 F.3d at 241, where, as here, the SRO's decision "has been thorough and careful," *R.E.*, 694 F.3d at 184, the Court finds that the SRO correctly determined that the DOE offered D.G. a FAPE in the least restrictive environment for the 2012-2013 school year, and consequently, that D.G.'s parents are not entitled to reimbursement for the tuition paid to the Churchill School.  Thus, the Court "need not reach the issues whether the private placement ... was appropriate, or whether equitable considerations affect relief." *A.C.*, 553 F.3d at 173 (citations omitted); *T.P.*, 554 F.3d at 254 (same).

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED and Defendant's motion for summary is GRANTED.  The Clerk of

Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

        SO ORDERED.

Dated:       February 25, 2015
                New York, New York

                                             _____
                                         KATHERINE POLK FAILLA
                                    United States District Judge